## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |
|---|---|
| RED ROOF FRANCHISING, LLC, | : |
| | :    Civ. A. No. 10-4120 (NLH)(JS) |
|         Plaintiff, | : |
| | : |
|         v. | :    **OPINION** |
| | : |
| AA HOSPITALITY NORTHSHORE, | : |
| LLC , et al., | : |
| | : |
|         Defendants. | : |

---

Appearances:

PETER JAY BOYER
HYLAND LEVIN, LLP
6000 SAGEMORE DRIVE
SUITE 6301
MARLTON, NJ 08053-3900
*Attorneys for plaintiff and counter defendant, Red Roof Franchising, LLC*

FRANK C. FUSCO
15 PRINCETON STREET
CLIFTON, NJ 07014
*Attorney for defendants and counter claimants, Alpesh Patel, Aruna Patel, AA Hospitality Northshore, LLC*

**HILLMAN, District Judge**

This matter involves an alleged breach of a Red Roof Inn franchise agreement. Before the Court are three motions: plaintiff's motion for partial summary judgment, defendants' motion to amend or correct their opposition to summary judgment, and defendants' motion to strike plaintiff's affidavit. For the reasons explained below, the motion for partial summary judgment will be granted in part and denied in part; the motion to amend

or correct will be granted; and the motion to strike plaintiff's affidavit will be denied.

## I.   JURISDICTION

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).  Plaintiff Red Roof Franchising, LLC ("RRF") is a Delaware limited liability company. The sole member of RRF is RRF Holding Company, LLC ("RRF Holding"), a Delaware limited liability company.  The sole member of RRF Holding is Red Roof Inns, Inc., a Delaware corporation with its principal place of business in Columbus, Ohio. Defendant AA Hospitality Northshore, LLC ("AAHN") is a Minnesota limited liability company.  The members of AAHN are defendant Alpesh Patel, an individual and citizen of the State of New Jersey and defendant Aruna Patel, and individual and citizen of the State of New Jersey.  Plaintiff alleges that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## II.   BACKGROUND

On April 9, 2007, defendant AAHN entered into a written franchise agreement with Accor Franchising North America, LLC ("Accor") for a term of five years.  On the same day, Alpesh Patel and Aruna Patel (the "Patels"), executed a guarantee, indemnification and acknowledgment under which they guaranteed the performance of AAHN's obligations under the franchise

2

agreement.  The Patels operated a Red Roof Inn, using RRF's system and marks, in Duluth, Minnesota.  On June 30, 2007, Accor assigned its rights and obligations under the franchise agreement to plaintiff RRF.

On July 1, 2010, AAHN ceased operating the franchise as a Red Roof Inn and started operating it as an "America's Best Value Inn."  On July 2, 2010, RRF sent written notice to defendants advising them of termination of the franchise agreement effective July 6, 2010, as result of default due to abandonment.

RRF alleges that defendants have not paid franchise fees in the amount of $71,880.80, and that after termination, AAHN continued to use RRF's franchise system and marks in contravention of the franchise agreement.  RRF brought claims of breach of contract of the franchise agreement and of the guarantee, and seeks specific performance in the removal of the Red Roof signs and marks, and other proprietary and confidential information.  Defendants filed counterclaims for unconscionable franchise agreement and guarantee agreement, breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Minnesota Franchise Act.  Plaintiff seeks summary judgment on its breach of contract claims and on defendants' counterclaims.

3

III. <u>DISCUSSION</u>

Before addressing plaintiff's motion for partial summary judgment, the Court will address defendants' motions to correct a footnote in their opposition brief and to strike plaintiff's affidavit.

A.   **Motion to Amend or Correct Opposition**

In their opposition brief, defendants state "With regard to affirmative defenses, there exist genuine issues of material fact regarding Red Roof's having committed a prior material breach of the franchise agreement."  At the end of this sentence was a footnote (footnote one) simply stating, "Defendants hereby withdraw the remaining affirmative defenses set out in their Answer."[1]  Defendants seek permission to correct

---

1    The affirmative defenses listed in defendants' amended answer include: (1) Plaintiff's Amended Complaint fails to state claims upon which relief can be granted; (2) The prior and material breaches of contract and of the implied covenant of good faith and fair dealing by plaintiff discharged any obligation on the part of defendants to further perform and bars plaintiff's claims for relief; (3) Plaintiff is barred from seeking equitable relief under the doctrine of unclean hands; (4) The plaintiff, by its statements, acts and conduct, is estopped from asserting that the defendants breached the agreements referred to in plaintiff's Amended Complaint; (5) The contracts in question are unconscionable and unenforceable under the circumstances presented; (6) Plaintiff has waived any claims it may have had to the relief sought; (7) The conduct of plaintiff made it impossible or difficult for defendants to perform and discharged any obligation on the part of defendants to perform the obligations sued upon; (8) Plaintiff and defendants engaged in a course of performance which altered and/or clarified the rights

4

footnote one of their opposition.  According to the affidavit of

defendants' counsel, Jeffrey Goldstein, Esquire, in his haste to

file the opposition, he inadvertently deleted the majority of the

footnote.  The proposed corrected footnote states:

> Defendants hereby withdraw the remaining affirmative
> defenses set out in their Answer except for the
> wrongdoing of breach of contract and the covenant of
> good faith and the Minnesota Franchise Act. The
> discussion above on Red Roof's prior material breaches
> goes to both the related Affirmative Defense and the
> Counterclaims on breach of contract, covenant of good
> faith and Minnesota Franchise Act. Under the Minnesota
> Franchise Act a franchise agreement may not be
> terminated except for "good cause." Good cause is
> defined as the failure by a franchisee to comply
> substantially with the material and reasonable
> franchise requirements imposed by the franchisor.
> Because of Red Roof's prolific breaches, Defendants
> were unable to fully comply with all of their alleged

---

of the parties under the written agreements to which plaintiff
referred in its Amended Complaint; (9) Plaintiffs' claims are
barred for failure to make required disclosures concerning the
agreements sued upon; (10) The defendants were discharged from
any further obligation to perform by the failure of the
consideration for their contracts; (11) Plaintiff's claims are
barred in whole or in part by its own wrongdoing in connection
with the problems alleged; (12) Plaintiff's claims are barred by
its failure to provide adequate opportunity to cure the alleged
problems; (13) Plaintiff's claims are barred, in whole or in
part, by the defense of failure to mitigate damages; (14)
Plaintiff's claims are barred, in whole or in part, by the
defense of statute of limitations; (15) Plaintiff's claims are
barred, in whole or in part, by the defense of fraud; (16)
Plaintiff's claims are barred, in whole or in part, by the
defense of breach of contract by the Plaintiff; (17) Plaintiff's
claims are barred, in whole or in part, by the defense of laches;
(18) Plaintiff's claims are barred, in whole or in part, by the
defense of waiver; (19) Plaintiff's claims are barred, in whole
or in part, by its violations of applicable laws, including the
applicable franchise laws.

obligations but did substantially comply despite Red
Roof's serious failures to meet its obligations as set
forth above.

Plaintiff responded that it does not oppose defendants'
motion to amend or correct the footnote as long as the Court also
considers its response to the points raised by defendants in
response to their footnote.

Accordingly, the Court will grant defendants' motion to
amend or correct footnote one of its opposition to summary
judgment.  The arguments raised by plaintiff in response to the
footnote shall be considered along with its motion for summary
judgment.

**B.   Motion to Strike Affidavit of Joy Purvis**

In support of its motion for partial summary judgment,
plaintiff attached the affidavit of Robert Wallace, Executive
Vice President of RRF.  Attached to his affidavit were the
various written agreements between the parties, the letter of
termination, and a schedule of outstanding franchise fees owed
and calculation of lost profits.  In their opposition, defendants
argue that Wallace has no individual personal knowledge of the
billing, payment or accounts receivable history of the Patels,
and that the schedule of fees owed do not correlate to any
invoices or refer to the history of payments made by the Patels.
In their reply, plaintiff states that Wallace does have personal

6

knowledge of the facts in this case, as he swears to in his affidavit.  Plaintiff also argues that the spreadsheets attached to the Wallace affidavit provide sufficient evidence of the amount owed and takes into account the amounts paid by defendants.  Plaintiff further argues that defendants previously received invoices that correspond to each of the entries on the spreadsheets.

The day after plaintiff filed its reply, it also filed the declaration of Joy Purvis, the accounts receivable/credit collections supervisor at Red Roof Inns, Inc., an affiliate of the plaintiff, RRF.  Purvis declared, under penalty of perjury, that she attached true copies of invoices issued by RRF to defendant AAHN.  She declared that the invoices correspond to the entries on the account status report attached as an exhibit to the Wallace affidavit.

Defendants move to strike the Purvis declaration on grounds that it was untimely and violated Local Rule 56.1(a)[2]

---

2    New Jersey Local Rule 56.1(a) states:

On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion.  A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed. The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating

because it constituted new evidence.  Plaintiff responds that the
Purvis declaration was filed one day late due to an unexpected
delay in Purvis being located out of State and requests that the
Court permit it to file the Purvis declaration out of time.

There is no question that the proper time for plaintiff
to have requested permission for an extension to file the Purvis
declaration was prior to the reply deadline, and certainly prior
to the filing of the declaration on the Court's docket.  To
simply file it without permission and then only request
permission in response to a motion to strike is not proper
procedure.  The Court, however, has discretion to grant an
extension to file a reply brief, and finding no prejudice to the
defendants in permitting the declaration to be filed one day
after the deadline, shall grant plaintiff's request <u>nunc</u> <u>pro</u>
<u>tunc</u>.  <u>See</u> <u>U.S. Small Business Administration as Receiver for</u>
<u>Penny Lane Partners, L.P. v. Herbst</u>, No. 08-1396, 2009 WL
1351577, at *1 (D.N.J. May 14, 2009) (granting plaintiff an

---

agreement or disagreement and, if not agreed, stating each
material fact in dispute and citing to the affidavits and other
documents submitted in connection with the motion; any material
fact not disputed shall be deemed undisputed for purposes of the
summary judgment motion.  In addition, the opponent may also
furnish a supplemental statement of disputed material facts, in
separately numbered paragraphs citing to the affidavits and other
documents submitted in connection with the motion, if necessary
to substantiate the factual basis for opposition.  The movant
shall respond to any such supplemental statement of disputed
material facts as above, with its reply papers.

extension of time to file its reply).

       The Court also finds that the Purvis declaration does not violate Local Rule 56.1(a).  The declaration does not provide any new evidence or allege new facts.  Rather, it provides supplemental evidence in support of the Wallace affidavit regarding the invoices sent to the defendants, in response to the arguments raised by defendants in their opposition to summary judgment.

       Therefore, defendants are permitted to correct their footnote, and plaintiff is permitted to file its supplemental declaration of Joy Purvis.  The remaining motion is plaintiff's motion for partial summary judgment seeking judgment in its favor on its breach of contract claims and on defendants' counterclaims.

### C.   Standard for Summary Judgment

       Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

       An issue is "genuine" if it is supported by evidence

such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### 1.   Choice of Law

RRF seeks summary judgment on its claim for breach of the franchise agreement and guarantee.  A choice of law issue arises because the franchise agreement and guarantee contain choice of law provisions stating that the agreement shall be governed by the laws of the State of Texas.  In addition, the parties executed a "Minnesota Amendment" to the franchise agreement which states that "nothing in the Offering Circular or Franchise Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C ... ."

This Court exercises subject matter jurisdiction based on the diversity of citizenship of the parties.  A court sitting in diversity must follow the substantive choice of law rules of the forum state.  See Robeson Industries Corp. v. Hartford Acc. & Indem. Co., 178 F.3d 160, 165 (3d Cir. 1999).  Here, New Jersey's choice of law rules apply, the forum of plaintiff's choice.  New Jersey law states that a contractual choice of law provision will be upheld unless doing so would violate its public policy. Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 614 A.2d 124, 133 (N.J. 1992) (following the Restatement (Second) of Conflicts of Laws § 187 (1969), which provides that "the law of the state chosen by the parties will apply, unless either: (a) the chosen state has no substantial

11

relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties").

Although the Patels are citizens of New Jersey, the franchise is located in Minnesota.  New Jersey has no substantial relationship to a Minnesota franchise, whereas Minnesota has a strong policy in protecting a franchisee located within its boarders.  See Pacific Equipment & Irr., Inc. v. Toro Co., 519 N.W.2d 911, 916 (Minn.App. 1994) (finding that the Minnesota Franchise Act was passed as remedial legislation designed to protect franchises within Minnesota).

Under Minnesota law, if a franchisee is a Minnesota resident, partnership, or corporation, any choice of law clause contained in the franchise agreement is void.  Minn.Stat. § 80C.21[3]; see Randall v. Lady of America Franchise Corp., 532

---

3    Section 80C.21 is entitled "Waivers void" and states,

     Any condition, stipulation or provision, including any
     choice of law provision, purporting to bind any person
     who, at the time of acquiring a franchise is a resident

12

F.Supp.2d 1071, 1088 (D.Minn. 2007) (explaining that the Minnesota legislature meant for § 80C.21 to be construed broadly and amended it in 1989 to void choice of law clauses); <u>Healy v. Carlson Travel Network Associates, Inc.</u>, 227 F.Supp.2d 1080, 1085-86 (D.Minn. 2002) (noting that since the 1989 amendment, Section 80C.21, the Minnesota Franchise Act non-waiver provision, has been held to override contractual choice of law).

Plaintiff acknowledges that Minnesota law voids any choice of law provision in a franchise agreement, but argues that Texas law should still be applied to "common law issues."  Since Minnesota law applies to the franchise agreement and voids the choice of law provision, Texas law does not apply.  Rather, as a Court sitting in diversity, we apply New Jersey choice of law principles to determine whether New Jersey or Minnesota law applies to the common law claims.

**2.   Breach of Contract (Franchise Agreement)**

As stated, <u>supra</u>, since the franchise is located in

_____

of this state, or, in the case of a partnership or corporation, organized or incorporated under the laws of this state, or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minnesota, Minnesota has a substantial interest in having its law applied to breach of the franchise agreement.  Even so, there is no true conflict between New Jersey law and Minnesota law with regard to breach of contract.[4]  Both States require a plaintiff to prove the existence of the following elements: a valid contract, performance, breach, and damages.  Compare Murphy v. Implicito, 392 N.J.Super. 245, 920 A.2d 678, 689 (App.Div. 2007) ("To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result."), with City of Farmington Hills Employees Retirement System v. Wells Fargo Bank, N.A., --- F.Supp.2d ----, 2012 WL 1021679, at *2 (D.Minn. 2012) ("Under Minnesota law, proof of a breach of contract claim requires four elements: (1) the existence of a contract; (2) breach of the terms of the contract; (3) causation; and [(4)] damages").  Since there is no actual conflict between New Jersey and Minnesota law, "the inquiry is over and, because

---

4    Although Minnesota law voids the Texas choice of law provision, there also is no conflict with Texas law regarding breach of contract.  See Godfrey v. Security Service Federal Credit Union, 356 S.W.3d 720, 726 (Tex.App. 2011) ("[T]he elements of a breach of contract claim are the existence of a valid contract, performance or tendered performance by a plaintiff, breach of the contract by the defendant, and damages caused by the breach.").

New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." <u>Cooper v. Samsung Electronics America, Inc.</u>, 374 Fed.Appx. 250, 254 (3d Cir. 2010).

As stated above, to prove a claim for breach of contract, a plaintiff must demonstrate that a valid contract existed and that the defendant failed to perform under the contract causing injury.  <u>See</u> <u>Murphy</u>, 920 A.2d at 689.  There is no dispute between the parties that a valid franchise agreement exists, and that it was entered into on April 7, 2009.  AAHN agreed to operate a Red Roof Inn for a period of at least five years.  On July 1, 2010, AAHN cease to operate the franchise as a Red Roof Inn, prior to the agreed-upon five year commitment.

RRF argues that it has performed its duties under the contract but that AAHN breached Section 13.3 of the franchise agreement by ceasing to operate a Red Roof Inn on July 1, 2010. Section 13.3 states:

> Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Franchise Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following:
> If Franchisee ceases to do business at the Approved Location, or ceases to operate the Inn under the Proprietary Marks and System ...

RRF also alleges that AAHN failed to pay outstanding

franchise fees owed upon termination in the amount of $71,880.80, and breached their post-termination obligations by using the RRF franchise system and marks after termination.  RRF also alleges that it lost future profits in the amount of $90,923.36.

Defendants do not dispute that they ceased to operate a Red Roof Inn on July 1, 2010, or that they owed certain fees under the franchise agreement.[5]  Rather, they raise two arguments: (1) that RRF breached the contract and RRF's breach excuses defendants from performance under the contract; and (2) that the amount of fees owed has not been properly documented by RRF.

With regard to the first argument, although a material breach of a contract by one party can excuse performance by the other party, see Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc., 357 F.Supp.2d 788 (D.N.J. 2005), "[u]nder settled franchise law, '[u]nder no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits."  Ramada Worldwide, Inc. v.

---

[5]     Defendants state that they assume for purposes of summary judgment that RRF's allegation of their failure to pay is true. If in fact, defendants feel that the allegation is untrue, the time to dispute it is when faced with a summary judgment motion. Thus, the Court will also assume that defendants did not pay the required fees under the franchise agreement.  In any event, defendants provide no facts that could show that they paid the fees.

Hotel of Grayling, Inc., No. 08-3845, 2010 WL 2674460, at *9

(D.N.J. June 30, 2010) (emphasis in original)(citing S&R Corp. v.

Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992));

General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296,

315 n.5 (3d Cir. 2001) ("It is hornbook law that when one party

to a contract commits a material breach, the non-breacher has the

option of either continuing the contract and suing for partial

breach, or terminating the agreement in its entirety.") (citing 2

E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 8.16, at 495 (2d ed.

1998)).  Thus, the relevant inquiry is whether RRF materially

breached the franchise agreement so that the defendants were

justified in not paying the required fees, and if defendants also

ceased to take advantage of the benefits under the franchise

agreement.[6]

---

6    Again, there is no conflict between New Jersey and Minnesota
law on the issue of a non-breaching party's options.  Under
Minnesota law, as under New Jersey law, although a material
breach of a contract by one party can excuse performance by the
other party, see Soderbeck v. Center for Diagnostic Imaging,
Inc., 793 N.W.2d 437, 441 (Minn.App. 2010), the non-breaching
party may either stop performance and assume the contract is
avoided, or continue its performance and sue for damages.  Murphy
Oil USA, Inc. v. Brooks Hauser, 820 F.Supp. 437, 442 (D.Minn.
1993) (proper remedy when faced with breach of a contract is
either "rescission, a suit for damages or mutual modification
through a re-negotiation of the contract; a party is not excused
from performance absent impossibility, death of a party, accord
and satisfaction, novation or other similar occurrences) (citing
Arthur L. Corbin, CORBIN ON CONTRACTS, §§ 1228-67, 1276-86,
1293-97)); see Radisson Hotels Intern., Inc. v. Kaanam LLC, 2011

Defendants rely on the declaration of Alpesh Patel in support of their claim that RRF's actions amounted to breach under the contract.[7]  Specifically, Patel states that: RRF failed to create any new advertising or marketing programs that generated new customers for the hotel; RRF failed to operate the current advertising and marketing programs efficiently; RRF did not have the expertise to operate the "RediCard Frequent Card

---

WL 98129, at *3 (D.Minn. Jan. 12, 2011) ("It is black-letter contract law that when a nonbreaching party responds to the other party's breach by choosing to keep the contract in force, "the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain.") (citing Richard A. Lord, 13 WILLISTON ON CONTRACTS § 39:32 (4th ed. 2010)); Pragmatic Software Corp.v. Antrim Design Systems, Inc., 2003 WL 244804, at *7 (D.Minn. Jan. 28, 2003) (A non-breaching party may not stop performance and continue to take advantage of the contract's benefits) (citing S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992)).

7    The declaration of Alpesh Patel in this case raises the same complaints raised in the declaration of Asvin Patel filed in another case before this Court, Red Roof Franchising, LLC v. Asvin Patel, Civil Action No. 10-4065(NLH)(JS).  The only discernable difference is that the Alpesh Patel declaration refers to his father's, Asvin's declaration, and states that after Red Roof terminated the father's franchise in New Jersey, "Red Roof employees swarmed into [his] father's hotel and stole private and confidential information and belongings from [his] father's hotel."  Alpesh Patel states that he "chose to close [his] doors before Red Roof could commit this crime at [his] property." Thus, it appears that after having received a notice of default from Red Roof Inn dated June 7, 2010 (noticing a termination date of September 9, 2010, if default was not cured), the Patels, in this case, decided to terminate the franchise prior to being terminated.

Program"; RRF did not put any revenue into the "corporate program" which dealt with trucking companies; the reservation system went "down" or failed eight to nine times, sometimes for a day and a half, during which time it was not possible to make reservations; RRF visited the franchise only once a year, or once every eighteen months; there were no guest surveys linked to the "Fidelio system"; RRF never performed a "sales blitz"; RRF did not continue the "Operation Red" renovations program; RRF did not provide underlying documents for invoices when requested; certain fees such as "Global Distribution System (GDS) fees" and "connectivity fees" increased; and RRF failed to install a front office system at a cost of $25,000.  The Patel declaration also generally list 23 areas in which he alleges RRF failed to perform, but which are not supported by any facts.[8]

In their brief, defendants cite to section 3 of the franchise agreement which lists the duties of the franchisor. Section 3, however, does not specify that RRF must create new advertising or marketing programs; must have expertise in operating the "RediCard Frequent Card Program"; must put revenue

---

[8]    This list of duties is also repeated in defendants' brief. Although defendants cite to paragraph 3 of the franchise agreement in support of their list, their list appears much more expansive than the actual agreement.  It is not clear whether the duties appear in other sections of the agreement since defendants provide no further citations.

into a "corporate program"; must visit the franchise more than
once a year; must provide guest surveys linked to the "Fidelio
system";[9] must perform a "sales blitz"; must continue the
"Operation Red" renovations program; must provide underlying
documents for invoices when requested;[10] must not increase "GDS
fees" and "connectivity fees"; or must install a front office
system.[11]

RRF argues that it never agreed in the franchise
agreement to create "new" advertising or marketing programs, or
to continue the "RediCard Frequent Card Program."  RRF states
that there is no obligation for it to visit defendants' facility.
Thus, the most that defendants have alleged regarding these
complaints is a dissatisfaction with RRH.  They have not shown

---

9    Exhibit B to the franchise agreement is the Fidelio Software
License Agreement.  Defendants do not indicate that there is any
provision in Exhibit B regarding guest surveys.

10    Although not technically a breach of Section 3 of the
franchise agreement, RRF would have a duty to provide supporting
documentation of its invoices.  This complaint appears to now be
moot given the declaration of Joy Purvis attaching the underlying
invoices.

11    Defendants do not indicate where in the franchise agreement,
or its exhibits, is any promise to install a front office system.
If defendants paid $25,000 pursuant to the agreement, but RRF
failed to install the system, then those facts could support a
claim of breach.  Defendants, however, have produced no evidence
that $25,000 was paid.

that RRF has breached the franchise agreement.[12]

Even if the complaints could be considered breaches of the franchise agreement,[13] defendants continued to take advantage of the contract's benefits.  As stated above, the non-breaching party may not stop performance while continuing to take advantage of the contract's benefits. See Murphy, 920 A.2d at 689.  Here, defendants cease to operate as a Red Roof Inn on July 1, 2010. Prior to that date, they received the benefits under the franchise agreement and, therefore, are obligated to pay any fees

---

12   Although defendants rely heavily on Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc., 357 F.Supp.2d 788 (D.N.J. 2005), that case is not on point with the issues in this case. In Travelodge, the Court denied summary judgment because it permitted parole evidence suggesting that Travelodge had promised to increase defendant's reservations by fifteen percent to induce it to enter into the contract.  Id. at 790-91, 795.  There are no such allegations of fraud in the inducement in this matter. Also, in Travelodge, the franchisee terminated its contract with Travelodge and ceased to operate as a Travelodge before Travelodge sued to recover unpaid recurring fees.  Id. at 793-94. The franchisee did not impermissibly seek to retain benefits under the franchise agreement while not paying fees it owed.  Id.

13   Two of the listed complaints by defendants could be construed as breaches; namely, that RRF did not efficiently operate the advertising and marketing programs, and that the reservation system failed eight to nine times.  Section 3.3 of the franchise agreement requires that franchisor "maintain and administer an Accel Reservation System and a Marketing Program, subject to the provisions of Section 10."  Section 10 outlines duties regarding marketing.  If RRH failed to properly operate the advertising and marketing programs, and the Accel program failed a certain number of times, such events could be construed as breaches.

21

due under the franchise agreement that accrued prior to July 1, 2010.[14]  Accordingly, plaintiff's claim for breach of the franchise agreement will be granted regarding fees incurred up to July 1, 2010.

However, after July 1, 2010, plaintiff admits that defendants ceased operating as a Red Roof Inn and began operating as an America's Best Value Inn.  Therefore, as of July 1, 2010, defendants were no longer receiving the benefits of operating as a Red Roof Inn franchise.  Thus, plaintiff's have not proved its claim on summary judgment that defendants continued to use the RRF franchise system and marks after termination.  A genuine dispute of material fact exists as to how defendants could operate as a different hotel while at the same time continue to use the Red Roof Inn system and marks.  Plaintiff has presented no facts in support of this allegation and, therefore, this portion of its claim will be denied on summary judgment.

Defendants' second argument is that RRF did not adequately support the amount of damages.  As stated above, RRF

---

14   This ruling does not adjudicate defendants' counterclaims for breach of contract which will be addressed separately below. See McDonald's Corp. v. Robert A. Makin, Inc., 653 F.Supp. 401, 403 (W.D.N.Y. 1986) (adjudicating defendants' counterclaims even though Court rejected their claim that alleged wrongs of plaintiff constituted affirmative defenses to defendants' non-payment of franchise fees).

submitted copies of the underlying invoices attached to the declaration of Joy Purvis.  RRF also submitted the affidavit of Robert Wallace and attached as Exhibits H and I, a calculation of damages.[15]

Defendants also state that the chart attached to Patel's declaration shows they met the payment program, and that the email from Asvin Patel to Rob Wallace indicated that the Patels had accepted Red Roof's offer to keep the franchise in good standing.  There are several problems with these statements. First, although Asvin Patel states that the "chart" was prepared by him based on his personal knowledge, the amounts invoiced on 3/22/10 for $38,072.27, and on 6/6/10 for $46,947.04 are not indicated as paid.[16]  Second, there is no "email" attached to the

---

15   Defendants argue that Wallace has no personal knowledge regarding the fees owed.  In his affidavit, Wallace swears that he is personally familiar with the facts and circumstances regarding the events stated in his affidavit.  There is no indication that the Wallace affidavit is not adequate and it shall be considered as evidence by the Court.

16   It is not clear if the amount invoiced on 7/2/10 is for franchise fees that occurred prior to July 1, 2010.  Also, the amount invoiced on 8/11/10 is listed as "liquidated damages" which are not included in franchise fees, and also not permitted pursuant to Minnesota Franchise law.  See Holiday Hosp. Franchising, Inc. v. H-5, Inc., 165 F.Supp.2d 937, (D.Minn. 2001) ("There is no question that the Minnesota Franchise Act precludes liquidated damages for premature termination of the franchise license agreement.").

declaration.  Lastly, it is not clear how an email from "Asvin Patel" a non-party to this litigation, and non-signatory to the guarantee could accept an offer concerning the franchise.

Defendants also argue that the calculation of damages do not take into consideration the payments made by them, and do not indicate the type of fee.  Defendants' dispute over the amount of damages, however, does not challenge the fact that RRF incurred damages as a result of the breach.  Given that RRF has established that it incurred damages, it is entitled to summary judgment on its claim of breach of the franchise agreement.  See Northern States Power Co. v. Lyon Food Products, Inc., 304 Minn. 196, 202, 229 N.W.2d 521, 525 (Minn. 1975) ("Having determined that plaintiff had suffered damage, the fact that it is difficult to establish the amount does not necessarily preclude recovery.").  Nevertheless, the Court agrees that plaintiff must provide a full and complete accounting of damages, including a breakdown by type of fee charged and history of payments made by defendants.[17]  Accordingly, plaintiff shall file a separate motion for award of damages in keeping with this Opinion.

---

17   As discussed, infra, RRF also seeks to recover lost profits. To recover lost profits, a party must prove the amount of damages sustained. Faust v. Parrott, 270 N.W.2d 117, 120 (Minn. 1978). Thus, there is some uncertainty regarding the exact amount of damages.

24

**3.   Breach of Contract (Guarantee)**

When AAHN entered into the franchise agreement, the Patels executed a guarantee, indemnification and acknowledgment under which they guaranteed the performance of AAHN's obligations under the franchise agreement.  RRF argues that the Patels breached the guarantee.

As with any contract, RRF must demonstrate that a valid contract existed and that the defendants failed to perform under the contract causing injury.  See Murphy, 920 A.2d at 689.  RRF has attached a copy of the guarantee as Exhibit D to the Wallace affidavit.  The guarantee states that "as an inducement to and as additional consideration for" the franchisor "to enter into" the franchise agreement that the Patels guarantee to franchisor that all of franchisee's obligations under the agreement will be punctually paid and performed.  The guarantee is signed by the Patels.

RRF states that it, and its predecessor, Accor, performed under the guarantee since it entered into the franchise with AAHN who operated a Red Roof Inn.  RRF states that the Patels have breached the guarantee by failing to have AAHN operate a Red Roof Inn for at least five years and to pay fees to RRF under the franchise agreement, as required under the

25

guarantee.  RRF states that it has been damaged and is owed $71,880.80 in unpaid franchise fees, and $90,923.36 in expected franchise royalty fees.

Defendants do not address RRF's argument with regard to breach of the guarantee.  Extrapolating from their argument regarding the breach of the franchise agreement, presumably, defendants' position is that since RRF breached the franchise agreement, that AAHN does not owe the alleged fees, and if AAHN does not owe the alleged fees, then the Patels are not in breach of the guarantee.

As explained above, RRF has met the elements of breach of the franchise agreement (with the exception of use of the system and marks after July 1, 2010), and has established that AAHN owes it fees under the franchise agreement (in an amount to be determined).  RRF has also established that a valid guarantee exists, that it performed under the guarantee, that the Patels did not abide by the terms of the guarantee, and that RRF incurred damages as a result.  Defendants have not presented any evidence in opposition.  Therefore, RRH's motion with regard to breach of contract regarding the guarantee will be granted.

### 4.   Counsel Fees

RRF asserts that both the franchise agreement and

guarantee provide that upon default, RRF is entitled to recover its counsel fees and costs incurred in enforcing its rights under the agreements.  Even though attorneys' fees are generally considered procedural and federal courts apply federal procedural rules rather than state procedural rules, in diversity cases, the Third Circuit has held that state procedural rules apply concerning attorneys' fees.  McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 775 n. 47 (3d Cir. 1990) (stating that "[s]tate rules concerning the award or denial of attorneys' fees are to be applied in cases where federal jurisdiction is based on diversity or if the court is exercising pendent jurisdiction, provided such rules do not run counter to federal statutes or policy considerations.").

Under New Jersey law,[18] attorney fee contract clauses are enforceable.  Ramada Worldwide Inc. v. Courtney Hotels USA,

---

18   There is no conflict between New Jersey and Minnesota with regard to an award of attorneys' fees.  Under Minnesota law, as under New Jersey law, attorney fee clauses are enforceable.  See United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equipment, LLC, --- N.W.2d ----, 2012 WL 832833, at *4, (Minn. Mar. 14, 2012) (finding that early cases reveal that parties have used attorney fee contractual provisions since at least 1858."); Correll v. Distinctive Dental Services, P.A., 636 N.W.2d 578, 582 (Minn.App. 2001) ("A party may not recover attorney fees from an opponent unless a statutory or contractual provision expressly allows for such recovery.); Days Inn Worldwide, Inc. v. SBSB, LLC, No. 08-6474, 2010 WL 3546958, at *6 (D.Minn. Sept. 7, 2010)(finding franchisor may recover attorneys' fees pursuant to agreement).

LLC, No. 11-896, 2012 WL 924385, at *7 (D.N.J. March 19, 2012) (finding that "Attorneys' fees clauses are enforceable in New Jersey" and awarding attorneys' fees and costs based on provision in franchise agreement); see Jackson Hewitt, Inc. v. Barnes Enterprises, No. 10-05108, 2012 WL 1600572, at *3 (D.N.J. May 7, 2012) (awarding attorneys' fees and costs where franchise agreement made clear that plaintiff was entitled to such award). Defendants do not dispute the provision in the franchise agreement or guarantee awarding reasonable attorneys' fees and costs. Accordingly, RRH is entitled to its reasonable attorneys' fees and costs.[19]

### 5. Defendants' Counterclaims

In addition to seeking summary judgment on its breach of contract claims, RRF moves to dismiss defendants' counterclaims. Defendants did not address any of RRF's arguments to dismiss their counterclaims in their opposition brief. Therefore, the Court will rely on defendants' argument raised in their amended answer as well as their revised footnote regarding their affirmative defenses for breach of contract and MFA violations. Each counterclaim is addressed separately below.

---

19  Counsel must abide by Fed.R.Civ.P. 54, and Local Rules 54.1 and 54.2 setting forth the requirements for filing a motion for attorneys' fees and costs.

### 1.   Count 1 (Unconscionable Franchise Agreement/Guarantee Agreement)

RRF moves to dismiss this counterclaim on grounds that there is no evidence in the record to suggest that either the franchise agreement or guarantee was either procedurally or substantively unconscionable.  Since defendants withdrew this counterclaim and did not provide any argument or evidence in opposition, this counterclaim shall be dismissed.

### 2.   Count 2 (Breaches of Contract by Red Roof-Franchise Agreement)

It is now defendants burden to show that a valid contract existed and that RRF failed to perform under the contract causing injury.  See Murphy, 920 A.2d at 689.  As stated, there is no dispute a valid franchise agreement exists.  As explained in footnote 13 supra, the Court has determined that two of the various listed complaints by defendants could potentially be construed as breaches; namely, that RRF did not efficiently operate the advertising and marketing programs; and that the reservation system failed eight to nine times, sometimes for a day and a half, during which time it was not possible to make reservations.  Section 3.3 of the franchise agreement requires that franchisor "maintain and administer an Accel Reservation System and a Marketing Program, subject to the

29

provisions of Section 10." Section 10 outlines duties regarding marketing. If RRH failed to properly operate the advertising and marketing programs, and the Accel program failed a certain number of times, such events could be construed as breaches.

However, regardless of possible breach, as explained above, if RRF did breach the contract, then defendants had the option of either terminating the contract and ceasing to perform, or continuing to perform and suing for damages. See General Motors, 263 F.3d at 315 n.5 ("It is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of either continuing the contract and suing for partial breach, or terminating the agreement in its entirety."); Radisson Hotels, 2011 WL 98129, at *3 ("It is black-letter contract law that when a nonbreaching party responds to the other party's breach by choosing to keep the contract in force, "the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain."). Here, prior to July 1, 2010, defendants did not pay fees as agreed to under the franchise agreement, but continued to operate as a Red Roof Inn. After they terminated the franchise and ceased to operate as a Red Roof Inn, they presumably no longer received the benefit of the franchise. Thus, to the extent that RRH seeks payment of fees

under the franchise agreement after July 1, 2010, then
defendants' counterclaim would survive summary judgment.
However, it is not clear from the record at this point if RRH is
seeking fees after July 1, 2010, and as directed by the Court,
will need to submit a revised calculation of its damages.
Accordingly, RRH's motion seeking dismissal of defendants'
counterclaim for breach of contract shall be denied without
prejudice.

### 3.   Count 3 (Breach of the Covenant of Good Faith and Fair Dealing)

RRF argues that, despite Minnesota's waiver of choice
of law provisions in franchise agreements, Texas law should be
applied to defendants' common law claim for breach of the implied
covenant of good faith and fair dealing.  This is a somewhat
unusual situation because Minnesota law, which governs the
franchise agreement, voids the Texas choice of law provision, but
the breach of the covenant of good faith and fair dealing is a
tort.  See Schultze v. Chevron Oil Co., 579 F.2d 776, 781 (3d
Cir. 1978) (finding recovery may also be available on a tort
theory if actions breached the implied covenant of good faith and
fair dealing).  Whether to apply a choice of law provision in a
contract to the tort of breach of the implied covenant of good
faith and fair dealing often turns on how broad the contractual

31

language is concerning the choice of law provision.  See Caton v. Leach Corp., 896 F.2d 939, 943 (finding that California choice of law provision was too narrow and did not cover tort duty of good faith and fair dealing) (5th Cir. 1990).  Here, as stated, Minnesota law, which governs the franchise agreement, nullifies any choice of law provision.  RRH has not presented any argument that the contract would cover any tort disputes concerning the parties.  Thus, the Texas choice of law provision does not apply and, as a Court sitting in diversity, we apply New Jersey law choice of law principles for tort actions to determine whether New Jersey or Minnesota law applies.

In tort cases, New Jersey follows the Restatement (Second) of Conflict of Laws (1971), which is the "most significant relationship" test.  P.V. v. Camp Jaycee, 962 A.2d 453, 455 (N.J. 2008).  This choice-of-law test is a two-step analysis in which the Court must first "examin[e] the substance of the potentially applicable laws" to determine whether an actual conflict exists.  Id. at 453.  If there is a conflict, the second step begins with a presumption that the local law of the state of the injury will apply.  Id.  Once that presumptively applicable law is identified, the choice is tested against the following contacts: a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the

domicile, residence, nationality, place of incorporation and
place of business of the parties, and (d) the place where the
relationship, if any, between the parties is centered.  Id.
Finally, the following interests are considered: the interests of
interstate comity; the interests of the parties; the interests
underlying the field of tort law; the interests of judicial
administration; and the competing interests of the states.  Id.
If another state has a more significant relationship to the
parties or issues, the presumption will be overcome.  If not, it
will govern.  Id.

        Both New Jersey and Minnesota recognize an implied
covenant of good faith and fair dealing in every contract.
Compare Wood v. New Jersey Mfrs. Ins. Co., 206 N.J. 562, 577, 21
A.3d 1131, 1140 (N.J. 2011) ("We recently re-emphasized that
'every contract in New Jersey contains an implied covenant of
good faith and fair dealing[, t]hat is, neither party shall do
anything which will have the effect of destroying or injuring the
right of the other party to receive the fruits of the
contract[.]'"), with In re Hennepin County 1986 Recycling Bond
Litigation, 540 N.W.2d 494, 502 (Minn. 1995) ("Under Minnesota
law, every contract includes an implied covenant of good faith
and fair dealing requiring that one party not 'unjustifiably
hinder' the other party's performance of the contract.").  Since

33

there is no actual conflict between New Jersey and Minnesota law, "the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." Cooper v. Samsung Electronics America, Inc., 374 Fed.Appx. 250, 254 (3d Cir. 2010). Accordingly, New Jersey law applies.

Defendants present no facts in support of their claim for breach of the implied covenant of good faith and fair dealing. They provide no argument in their opposition except, in their revised footnote one, defendants state that the "discussion above on Red Roof's prior material breaches goes to ... the Counterclaims on ... covenant of good faith." Defendants have not, however, presented evidence that RRF did anything which had "the effect of destroying or injuring [their right] to receive the fruits of the contract." Wade v. Kessler Institute, 343 N.J.Super. 338, 345, 778 A.2d 580, 584 (App.Div. 2001). As explained above, defendants have listed several complaints concerning RRF as franchisor which not only do not amount to breaches of the franchise agreement, but also do not show that they destroyed or injured defendants' rights to receive the fruits of the contract. RRF argues that there is no dispute that AAHN abandoned the franchise and that there is no evidence in the record of bad faith or motive by RFF in terminating the franchise

34

after abandonment.  The Court agrees.  Accordingly, defendants'
claim for breach of the implied covenant of good faith and fair
dealing will be dismissed.

### 4.    Count 4, 5 and 6 (Violation of the Minnesota Franchise Act)

The Minnesota Franchise Act, Minn.Stat. ch. 80C.
("MFA"), "was adopted in 1973 as remedial legislation designed to
protect potential franchises within Minnesota from unfair
contracts and other prevalent and previously unregulated abuses
in a growing national franchise industry." Clapp v. Peterson,
327 N.W.2d 585, 586 (Minn. 1982) (citing Martin Investors, Inc.
v. Vander Bie, 269 N.W.2d 868 (Minn. 1978)).  In their
counterclaim, defendants argue that RRF violated the MFA because
it lacked good cause to terminate the franchise agreement, and
that RRF failed to provide proper notice of termination.
Defendants also generally allege in their amended complaint that:

a.  the Patels had fully complied to the best of their
capabilities with the requirements imposed upon them by Red Roof;

b. the Patels had substantially complied to the best of
their capabilities with the requirements imposed upon them by Red
Roof;

c. the requirements that Red Roof previously attempted
to and did impose on the Patels were unreasonable;

35

d. there was no bona fide justification for Red Roof's termination, and nonrenewal;

e. Red Roof's termination stripped the Patels of their reasonable opportunity to recoup their franchise investment and obtain a reasonable rate of return on its franchise investment;

f. Red Roof refused to negotiate in good faith with the Patels regarding the terms of the new non-negotiable unconscionable franchise agreement;

g. the termination was grossly disproportionate to the breaching-act that Red Roof cites against the Patels, because Red Roof was the primary actor in bringing about the wrongful termination;

h. The regulations enacted under the Minnesota Franchise Act provide that it is an unfair and inequitable practice for any franchisor to discriminate between franchisees in regard to the charges offered or made for royalties, goods, services, equipment, advertising services, or any other business dealings;

I. Red Roof discriminated against the Patels with regard to conditions of payment of their franchise fees;

j. The regulations also provide that it is an unfair and inequitable practice for any franchisor to impose on a franchisee any standard of conduct that is unreasonable; and

36

k. Red Roof imposed on the Patels standards of conduct that were unreasonable.

RRF argues that it had good cause to terminate the franchise because defendants voluntarily abandoned the franchise on July 1, 2010.

Under Minn.Stat. § 80C.14, subd. 3(b), a franchisor cannot terminate or cancel a franchise except for good cause. Dunn v. National Beverage Corp., 745 N.W.2d 549, 553 n.4 (Minn. 2008). Good cause is defined under the act as "failure by the franchisee to substantially comply with the material and reasonable franchise requirements imposed by the franchisor including, but not limited to ... voluntary abandonment of the franchise business." M.S.A. § 80C.14 Subd. 3(3)(b)(3). The facts are clear that defendants abandoned the franchise on July 1, 2010, and that RRF terminated the franchise agreement on July 6, 2010. Thus, RRF had good cause to terminate the agreement.

Defendants also argue in their counterclaim that RRF failed to provide proper notice of termination. The MFA prohibits termination of a franchise unless the franchisee is given "written notice setting forth all the reasons for the termination or cancellation at least 90 days in advance of termination or cancellation," and the franchisee "fails to correct the reasons stated for termination or cancellation in the

37

notice within 60 days of receipt of the notice....″ <u>Coyne's & Co., Inc. v. Enesco, LLC</u>, 553 F.3d 1128, 1130 n. 2 (8th Cir. 2009).  The MFA also provides exceptions to this rule, the first of which is "voluntary abandonment of the franchise relationship by the franchisee."  <u>See</u> M.S.A. § 80C.14 Subd. 3(a)(1).  Thus, because defendants voluntarily abandoned the franchise, RRF was not required to provide 90 days' notice of termination.

Defendants further argue in their counterclaim that RRF wrongfully required them to sign a franchise agreement that waived their right to a jury trial and consent to liquidated damages.  Defendants argue that such provisions violate the MFA.  RRF responds that it and AAHN executed a "Minnesota Amendment" that removed the jury waiver provision from the initial franchise agreement.  Also, RRF does not dispute that the MFA prohibits it from seeking liquidated damages.  RRF states that it is not seeking to collect liquidated damages; rather, it seeks to collect its lost profits.

Section 22.5 of the franchise agreement states that, to the extent permitted by law, franchisor and franchisee waive trial by jury.  This section is specifically deleted in the Minnesota Agreement executed by the parties which state that "Section 22.5 of the Franchise Agreement under the heading "Applicable Law" shall be deleted in its entirety and have no

force or effect ... ."  Thus, defendants have not waived their right to a jury trial and there is no MFA violation.

      With regard to lost profits, "there is no provision of Minnesota law or the contract between the parties which prevents [RRF] from seeking other contractual damages, such as damages for lost profits" under the franchise agreement.  Days Inn Worldwide, Inc. v. SBSB, LLC, No. 08-6474, 2010 WL 3546958, at *5 (D.Minn. Sept. 7, 2010) (citing Holiday Hosp. Franchising, Inc. v. H-5, Inc., 165 F.Supp.2d 937, 940 (D.Minn. 2001)).  Although defendants have not specifically argued that RRF's calculation of its lost profits is inaccurate, in their amended answer and counterclaim, defendants indicate that the franchise was not as profitable prior to termination.  This raises a question whether there were declining revenues.  In RRF's calculation, for the five months prior to termination, gross room revenues were less for three of the five months than the same months the year before.  For example, in March 2009, revenues were $60,682.00, while in March 2010, revenues were $43,943.80.  In May 2009, revenues were $78,478.59, while in May 2010, revenues were $69,280.48.  In June 2009, revenues were $137,207.70, while in June 2010, revenues were $92,318.73.  In February and April, 2010 revenues were higher than in 2009.  If revenues were declining, then the estimate of lost profits may be inflated.  See Days Inn,

39

2010 WL 3546958, at *5 (determining that whether lost profit calculation took into consideration declining revenues and the costs franchisor avoided because it no longer had to provide franchise services raised questions of fact the jury).  Thus, although the Court finds that RRF is entitled to its lost profits, and defendants counterclaim for violation of the MFA shall be dismissed, questions of fact remain as to the precise calculation of damages.

As for the remaining allegations that RRF's various actions were unreasonable, defendants have provided no evidence in support and, therefore, shall be dismissed.

### IV.   **CONCLUSION**

For the foregoing reasons, the motion for partial summary judgment filed by plaintiff will be granted in part and denied in part; the motion to amend or correct footnote one filed by defendants will be granted; and the motion to strike plaintiff's affidavit filed by defendants will be denied.  The Court will enter a briefing schedule regarding the motion for damages and for attorneys' fees.


                                     s/Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

Dated:   June 28, 2012

40